## COMMISSIONER OF INTERNAL REVENUE v. AIR REDUCTION CO., Inc.
### No. 277.

Circuit Court of Appeals, Second Circuit.

July 16, 1942.

Writ of Certiorari Denied Nov. 16, 1942.

See —— U.S. ——, 63 S.Ct. 201, 87 L.Ed. ——.

146

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Arthur A. Armstrong, Sp. Assts. to Atty. Gen., for petitioner.

Harry W. Forbes, of New York City (Shearman & Sterling, of New York City, of counsel), for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The taxpayer is a New York corporation manufacturing and selling oxygen and other derivatives of air, acetylene, carbide, carbonic acid gas and welding and cutting apparatus. During the year 1935 it acquired 22,347 shares of the stock of Pure Carbonic Company of America in exchange for 5,258 shares of taxpayer's own treasury stock. This treasury stock had been originally issued and was later repurchased for cash at a cost computed by the first-in-first-out method of $182,536.73. The fair market value of the Pure Carbonic Company stock acquired in the 1935 exchange was $888,602.00, making a gain upon the transaction as determined by the Commissioner of $706,065.27.

The Pure Carbonic Company was engaged in the manufacture and sale of carbonic acid gas and was operated during 1935 as a subsidiary of the taxpayer. On January 1 of that year taxpayer already owned 95,181 of Pure Carbonic's 130,099 shares then outstanding, having obtained 87,275 of them in exchange for its own stock and the rest for cash. Then during 1935 the total number of shares of Pure Carbonic was increased to 132,299, and taxpayer acquired 100% ownership by a cash purchase of 14,771 shares followed by the exchange described above. Thus about 82% of the Pure Carbonic stock was acquired for shares of Air Reduction stock and the balance for cash.

Also during 1935 taxpayer sold to certain of its officers 3,200 shares of its own treasury stock at $57.65 a share, or a total of $184,480. This stock had previously been issued and reacquired at a cost, found by the first-in-first-out method, of $120,973.81, making a gain on the transaction of $63,506.19. This was included in the tax return filed for 1935, but the taxpayer now claims that its inclusion was erroneous. These sales to the officers were made pursuant to options granted them two years before in order to afford them an opportunity to acquire a stock interest in the company. The price of $57.65 was the average cost to the taxpayer of all the treasury stock it held at the time.

The Commissioner assessed deficiencies of $97,083.98 and $35,303.26 in taxpayer's income and excess profits taxes respectively for 1935, and in its petition to the Board of Tax Appeals for a redetermination, the taxpayer sought a refund of $11,907.41 for overpayment. The two questions presented to the Board were whether any taxable gain was realized (a) from the exchange of treasury stock for the stock of Pure Carbonic and (b) from the sale of treasury stock to the officers of the company. The Board found for the taxpayer on both issues.

The Board largely founded its opinion that these transactions were not income to the taxpayer under § 22(a) of the 1934 Revenue Act, 26 U.S.C.A.Int.Rev.Acts, page 669, upon the case of Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536, which held invalid the retroactive application of a Treasury Decision almost identical with Art. 22 (a)-16 of Treasury Regulations 86 which the Commissioner seeks to apply prospectively here. The Board said further that there was an intimation in the R. J. Reynolds Co. case that the regulation was probably ineffective even when prospectively employed, and it was on the authority of two previous Board cases that it refused to apply it here. National Home Owners Service Corp. v. Commissioner, 39 B.T.A. 753; R. C. Reynolds, Inc., v. Commissioner, 44 B.T.A. 356.

To understand the R. J. Reynolds Co. case and its limits a review of the previous Treasury Regulations and Decisions on the subject of treasury stock is necessary. After Regulations 33 revised in 1918, all the Treasury Regulations involving income tax up to and including Regulations 77 interpreting the 1932 Revenue Act provided that the purchase and sale of treasury stock by a corporation was a capital

transaction resulting in no gain or loss. But the courts did not all follow these provisions, finally contained in Articles 66 and 176 of Regulations 77. See Commissioner v. Boca Ceiga Development Co., 3 Cir., 66 F.2d 1004, and cases cited therein. So on May 2, 1934 the Treasury issued T. D. 4430, XIII-1 Cum.Bull. 36 (1934) retroactively amending Regulations 65, 69, 74 and 77 to provide that the question of whether a gain or loss resulted from the acquisition and sale of treasury stock depended on the true nature of the transaction, and that a company dealing in its own stock as it would in that of another company would realize gain or loss. This new provision also operated prospectively and it was substantially incorporated into Art. 22(a)-16 of Regulations 86 promulgated February 11, 1935 and applicable to the 1934 Revenue Act. The text of the article is as follows:

"Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

"But if a corporation deals in its own shares, as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Act."

Helvering v. R. J. Reynolds Tobacco Co., supra, involved sales by that taxpayer in 1929 of shares of its own treasury stock purchased upon various occasions between 1921 and 1929. The income, if any, was taxable under the 1928 Act, 26 U.S.C.A. Int.Rev.Acts, page 351 et seq., and the Regulations pursuant thereto. Accordingly the attempt of the Commissioner to apply T. D. 4430 was a retroactive application, and the Supreme Court held it invalid for that reason. Subsequently the Treasury revoked T.D. 4430 in its entirety. T.D. 4895, 1939-1 Cum.Bull. 225. However, Art. 22(a)-16 of Regulations 86 was never rescinded, nor was it or the prospective effect of T.D. 4430 passed upon in the R. J. Reynolds Tobacco Co. case. The Court [306 U.S. 110, 59 S.Ct. 426, 83 L.Ed. 536] there specifically states, "We need not now determine whether, as has been suggested, the alteration of the existing rule, even for the future, requires a legislative declaration or may be shown by reenactment of the statutory provision unaltered after a change in the applicable regulation."

The taxpayer argues that even if the Supreme Court did not determine the point here in issue, the old regulation had become so much a part of the legislation, due to successive repassages of the Revenue Acts without change in the section construed, § 22(a), that a mere alteration of regulations could not change it even prospectively until Congress showed its consent. See United States v. Dakota-Montana Oil Co., 288 U.S. 459, 53 S.Ct. 435, 77 L.Ed. 893. But the effect of this rule has been considerably weakened in three subsequent Supreme Court cases. Morrissey v. Commissioner, 296 U.S. 344, 355, 56 S.Ct. 289, 80 L.Ed. 263; Helvering v. Wilshire Oil Co., 308 U.S. 90, 100, 101, 60 S.Ct. 18, 84 L.Ed. 101; Helvering v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 973, 85 L.Ed. 1438, 134 A.L.R. 1155. In this last case the Court said: "That rule is no more than an aid in statutory construction. While it is useful at times in resolving statutory ambiguities, it does not mean that the prior construction has become so embedded in the law that only Congress can effect a change. * * * It gives way before changes in the prior rule or practice through exercise by the administrative agency of its continuing rule-making power." Despite what we said to the contrary on this subject in E. R. Squibb & Sons v. Helvering, 2 Cir., 98 F.2d 69, modified 2 Cir., 102 F.2d 681, this manner of applying this rule of construction is now what should guide us and it justifies the conclusion that the regulation is effective in its prospective application.

Finding the regulation valid, we have but to determine whether the transac-

tions of the taxpayer were covered by it. The respondent contends that the regulation applies only to such active trading in the company's own stock as would normally be done for speculative purposes. But this, we think, is too narrow an interpretation. The regulation contemplates rather such dealing in one's own stock as exists whenever that treasury stock is employed as an ordinary asset as the stock of another corporation would be. Thus capital readjustments would be outside the scope of the regulation, but not a transaction where the treasury stock is dealt with as a normal asset of the corporation. This broad interpretation of the regulation is indicated in G.C.M. 16651, XV-2 Cum.Bull. 130 (1936), where the General Counsel rules that it would apply where a corporation purchased its stock in the open market and then sold it to employees pursuant to an employees' stock purchase plan. Also the courts have adopted the more general interpretation of the regulation. Allen v. National Manufacture & Stores Corp., 5 Cir., 125 F.2d 239, certiorari denied 316 U.S. 679, 62 S.Ct. 1106, 86 L.Ed. ——. There the purchase of the company's own stock on margin was made with the intention of retiring it, which was never done, however. Later the resale was made to a syndicate in order to satisfy the margin requirements. This was unlike the usual course of speculative trading, and indeed the intent was to effect a capital readjustment. Yet the court viewed it as a transaction yielding a taxable gain under the interpretation of Art. 22(a)-16 of Regulations 94 which is identical with the same article of Regulations 86.

■ Likewise here the two sets of transactions made use of the treasury stock just as though it were an ordinary asset. Part was used to pay for the Pure Carbonic Company's stock and part was sold for cash to officers pursuant to an option agreement. Neither of these dealings involved a capital readjustment, and the gain from each is taxable income. We notice in passing the similarity between the sales to the officers and the situation described above in G.C.M. 16651, supra.

■ Finally the taxpayer urges that, in the exchange by which the Pure Carbonic Company stock was acquired, no taxable gain could result because that was a nontaxable reorganization. But this theory is not tenable because the definition of reorganization in § 112(g) (1) (B) of the 1934 Act, 26 U.S.C.A.Int.Rev.Acts, page 695, contemplates only situations where the exchange is made "solely" for voting stock. Here over 17% of the Pure Carbonic stock was purchased for cash. Cf. Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789.

Reversed and remanded.

L. HAND, Circuit Judge (dissenting).

I tried to state in E. R. Squibb & Sons Co. v. Helvering, 2 Cir., 98 F.2d 69, why I thought that a corporation which dealt in its own shares could never be said to make a profit or loss except as the price paid or received did not represent the true value of the shares when they were bought or sold. That, as I understand it, is the almost unanimous opinion of accountants, and I have not yet seen how the reasoning can be escaped. But the Commissioner has seen fit to rule otherwise, and I understand Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114, 59 S.Ct. 423, 83 L.Ed. 536, to hold that the long-standing convention which thinks of such shares as "property" of the corporation like shares in another corporation, will support the regulation. However, although I find it very hard to extract any general test capable of application from the language chosen, as to the shares issued to the taxpayer's officers, I should not have been in doubt that the Board was right, were it not for my brothers' contrary conclusion. Even now, I cannot imagine how a corporation can deal in its own shares in a way less "as it might in the shares of another corporation," than when it offers them to its own officers as an inducement to give them an interest in the business; surely the shares of another corporation would not serve that purpose.

It is a closer question as to the purchase of the Pure Chemical shares from the United States Alcohol Company. It is possible to say that, just as the taxpayer used cash to buy the 14,771 shares, so it used "treasury" shares to buy the 22,347 shares. But if the meaning of the regulation is that any transaction is to figure in a gain or loss when "treasury" shares are used in a purchase as a consideration of value, hardly anything will be excluded, except transactions like the issue to the officers I have just considered. By the reissue the Alcohol Company exchanged an interest in the Pure Chemical Company for an interest in the taxpayer; and since

the taxpayer became in this way the only shareholder of the Pure Chemical Company, the upshot of the transaction was that the Alcohol Company reduced its proportionate interest in the assets of the Pure Chemical Company in exchange for an interest in the other assets of the taxpayer. Intangible and impalpable as the test is, it seems to me that in such a transaction the taxpayer was not dealing with its shares "in the same manner as though" they were "the shares of another." If it had used another's shares the Alcohol Company would not have become a member of the taxpayer's own group of shareholders. I should think that the regulation was meant primarily to cover buying and selling "treasury" shares for profit. Perhaps it covers more, but a transaction so close to a consolidation I think it does not cover. So it seems to me that the Board was right on both points.